Good morning, your honors. Raymond Buendia for the plaintiffs and appellants in this case. This is an appeal from a motion for summary judgment decision rendered in the San Diego District Court. There's no fast way to hear from San Diego. What does that mean, Buendia? Good morning? Good day? Good day in Spanish, Buendia. Buendia. Yes. This is a case essentially where the DEA went to the wrong house on a raid. And I represent four plaintiffs, the parents, and four minor children. And the defense in this case, which was argued in the motion for summary judgment, is that number one, even though they had no right to be there, the government, the DEA agents, were protected because... The problem in this case is that the no right to be there is kind of an irrelevant fact because you haven't actually proven that they had no right to be there and it's not pertinent to your theory of the case. This is not a constitutional case for lack of probable cause. We have no idea why they were there. We don't know if they had probable cause. All we know, it turns out they were in the wrong house. But it doesn't seem to have anything to do with the state law causes of action that you're litigating. Well, we argued in our opposition that they made a mistake because they had the wrong address. The surveillance that the DEA agents have been conducting... Is there anything in the record about any of this? We have an exhibit to our opposition. I think it was also an exhibit to the government's motion where on the return of the arrest warrant to the district court judge, in there they make a statement that they had the wrong address. And that that's the reason they didn't find the subject of the arrest warrant that they initially obtained from that particular judge. Did they have the wrong address because they transposed numbers or did they have a wrong address because although they had reason to think the guy lived there, he didn't? They had the wrong address. Or they were negligent? They may have been negligent. You don't know whether they were negligent? Well, the problem with the negligence argument is the Federal Tort Claims Act doesn't list negligence as one of the causes of action you can allege. We are limited in the Federal Tort Claims Act to a laundry list of causes of action that... But you didn't, for some reason, you didn't bring this as a 1983 case alleging that there was, they had no business going into that house because they didn't have probable causes. Not what this case is about. That's correct. It's a Federal Tort Claim Act claim. Why didn't you bring a 1983? Because you can't sue the U.S. government under Section 1983. Well, you can bring a Biffen section. Sorry, but you didn't bring it as a Biffen section. Right. We brought it as Federal Tort Claims Act, a claim against the agents and the agency, the DEA, because they went to the wrong house. As a matter of fact, we even presented some evidence that the husband was telling the DEA agents, the car you're looking for is two spaces down in that other house over there. Do you have any other theories in this case other than that they went to the wrong house? That is what the basis of this case is, is that they went to the wrong house and they admitted to the district court judge that they went to the wrong house. But how does that constitute assault and battery under state law? Because then they had no right to go into this house. They had no right because they were there. They didn't even allow anybody inside to answer the door to tell them that they had the wrong address. What are the elements of assault and battery under state law, which is your main claim, and you also have an intentional infliction claim, but start with the assault and battery claim. What are the elements under state law? Under state law, unlawful touching of another is the basic element. And it was unlawful because they had no right to be there? That is our contention, because they had the wrong address, they gave the wrong information to the judge that issued the arrest warrant, and then they admit later in written documents signed by a supervising DEA agent that they had the wrong address. And that's the reason they had no right to be at this house. And what was the touching? They rousted everybody. They threw the husband down on the floor of the house. They handcuffed everybody. They got the daughters out of the bed, handcuffed them. There are excerpts in the deposition about the handcuffs being too tight on everybody and having some residual pain there. They all received some care at a local hospital. These were 11, 14-year-old girls? Yes. And the record shows, and there's a dispute on that, that they had them lie down on their face, used profanity, handcuffed them. Were they clad? Were they clad? What were they wearing? Pajamas. Pajamas. They were asleep. This happened early in the morning, and they were all asleep. Yeah, yeah. And then the door just got tore off the hinges with a battering ram, and then walked in DEA agents that were dressed like SWAT officers with shotguns and machine guns, and were waking everybody up with these guns, facing them. Why didn't you bring a Bivens action? Because we thought a federal tort claim action was more appropriate. There's always a question whether or not the government will cover... In California law, is it a relevant consideration to the excessive force claim whether or not there was, whether they were in the wrong house? Yes, because the question of reason... Excuse me, do you have any case law on that? I think we cited some in our brief. If they were in good is that it's an analysis of reasonableness. Was it reasonable for them to be there in the first place? And we have no record on that. I mean, all you say is they were in the wrong house, but why were they in the wrong house? Because they wrote the wrong address down. And they wrote the wrong address down because they're stupid, or they wrote the wrong address down because they had reason to think he was in his house, but they were wrong. They went to the district court judge and said, this is the address. We believe that there is a particular person there we want to arrest, and this is the address. Did they have a basis for thinking that? Is there anything in the record that suggests they didn't have... That even addresses the question of whether they had a basis for thinking that? In the record produced by the government, there is some information in there about surveillance that was conducted by some DEA agents. And they go into this trailer park. My clients happen to live in a trailer park. They don't go all the way in. They just partially observe where some suspect is going. They also talk to a couple of people. I think that's also part of the record about where this person may be residing. They conclude that for some reason, my client's house is the site of where this person is either being harbored or lives. There is a description of a uniquely identifiable automobile that this suspect drives that happens to be parked at all times when this person isn't moving around a couple of trailer spaces down from my client's house. So it would have taken very little effort for a DEA agent just to do a quick drive through in this trailer park to see exactly where this car was. To the DEA... Your briefs don't address any of this, as I understand it. We addressed it in the motion for summary judgment. I know, but you're not in the district court now. You're here. And your briefs, as I read them, had nothing to do... They were assertions of excessive force, but they weren't assertions of lack of probable cause to be in the house. You said they were the wrong house, but you didn't say that they didn't have probable cause to be in the house or the warrant was invalid or anything like that. Well, we did argue in our motion for summary judgment that... I know, but you're here in this court now and you wrote briefs in this court. Whatever you said in the questions, what arguments have you made to us? We have made the arguments that they did not belong at this house and that because of that, the defensive elements of the assault and battery cause of action and the intentional affliction of emotional distress don't apply because the element of reasonableness runs through all the elements in these particular causes of action. Reasonableness cannot include a government agent just completely missing the mark on which house to go to. Well, in other words, you'll have a claim for assault and battery concerning these two young ladies, right? As to all four, including the parents. Okay, and the way they were treated after the agents got in the house. Correct. How they were roughed around and all the rest of it. So basically, your claim is that even assuming they had a right to go into the house, they had no right in assaulting these people, your clients. Yes, we are arguing that, but we have to take a step back because the fact in this case is they had no right to be in that house. And that fact can't be ignored. It's a fact that's the elephant in the house of these facts, and the government is trying to gloss over the fact that the DEA agents just completely got the wrong house. And they were even directed to where they needed to go, but they never did. Well, really, what difference does that make? If they went in there and they beat these people up and handcuffed them and swore at them and threw them on the ground, whatever they did, that's assuming they had a right to go in. That's still a battery. That's still an assault. Yes. That's what you're suing for. That and intentional infliction of emotional distress. That's intentional infliction of emotional distress. If the warrant were a valid warrant, they would have the right. They didn't, in fact, beat anybody up, as I understand it. They handcuffed them, roughly, and they were extremely rude to them, and they pulled guns on an 11-year-old girl, but they didn't beat anybody up. Is that right? They threw, they did, the husband. They threw him down on the ground, because the husband was resisting. He was trying to say, what are you doing here? You're going to you're in the wrong house, looking for someone that doesn't even belong here. There is evidence of that, and we presented that in the motion for summary judgment. Okay, let's hear from... Hey, it pleases the court. I'm Lindsay Powell for the government. Lindsay, it's better to stand in the middle, because we record all this. Okay. I thought I had to pick a microphone. Pictures, you know, everything. Yeah. I don't know if we take pictures or not, but you never know. Your Honor, the conducted issue in this case proceeded from the execution of valid search and arrest warrants, and as has already been discussed, there's no reason to think, from anything that's suggested in the record, that the warrants were not valid on their face, and that gave the agent's authority to be in the house. It's not... Well, apparently, they were just in completely the wrong place. Your Honor, it did prove to be true that this residence was not ultimately found to be connected to drug trafficking, but again, that doesn't call into question... And it wasn't only that. They said that the car was registered to that house, and it wasn't. Yes, Your Honor, that did end up being true, and that was part of... Perhaps they had probable cause to search that house when the premise on which they were searching it was just totally incorrect. So in terms of the officer's authorization, Leon says we look to the affidavit and whether probable cause was evident on the face of the affidavit, and... Unless it's not in good faith, and if somebody says that a car is registered to X house and it is not registered to that house, it's a false statement. So the warrant was issued on the basis of a false statement. Your Honor, I don't think there's any reason to think that what happened here approaches the Franks v. Delaware situation. It may well have been negligent. We don't know, because there's very little in the record about this, but there's no reason to think that the statement was made with deliberate or reckless... How does that even turn out to matter? If the claim is for excessive force while in the house under state law, as I understand the cases, there could be excessive force equaling an assault or battery under state law, even if the entry is privileged. Is that a correct understanding of state law? Yes, Your Honor. I think in some cases that would be true. Okay. So let's assume that the entry is privileged. For what reason is there no factual issue about excessiveness in relation to the children? So as long as the entry is privileged, the agents are entitled to use reasonable force as they move through the house to achieve the authorized objective. Right. That's a legal standard. Tell me about the facts, because maybe there are 11-year-olds who are drug traffickers, but it isn't very common. So focusing on the specific activities directed at the children, why don't they create an issue of fact on excessiveness as to the children? So under the reasonableness standard, we look to what the agents reasonably knew or believed at the time. And so I think it's important to walk briefly through the sequence of events. Knew or believed at the time when? When they were in the house executing the valid warrants. So they had search and arrest warrants. They reasonably believed that a dangerous drug trafficker with ready access to firearms and weapons was in the house. So that's the predicate. But shouldn't we find out what they knew? What steps they took to ascertain that these purported criminals were in this trailer park? Well, Your Honor, we do know a lot about what they knew and believed. Yes, Your Honor. They reasonably believed, based on the affidavit and the warrant, that a dangerous individual and weapons would be found in the house. What did they do to come to that conclusion? That's what I want to know. What did they do? To come to that conclusion? Well, Your Honor, they had a neutral magistrate return a warrant. You know, who was the neutral magistrate? I'm not aware of the name of the individual. You don't know who the magistrate was? Not offhand, Your Honor. Where was this magistrate? What was this person's position? I'm not sure I understand the question. It was a magistrate judge who returned the warrant in the ordinary course of things. Well, it doesn't mean that they... Honorable Anthony J. Patagnia, U.S. Magistrate Judge. Thank you, Your Honor. I'd like you to, if you would, focus on what happened with the children, because I still want an answer to why there is no issue of fact... Yes, Your Honor. ...with regard to the activities. If you would just... I want you to focus on why they went in there. You're both of them. How they... What caused them to believe that that was a den of iniquity? That's what I want to know. And you know why I want to know this? Because I've had a little more experience in life than you have. And what happened here is not uncommon. Huh? It's not uncommon. And many times they go in there with very little or no investigation. Many times they go in there and they don't check the records that are available to them to see who really is in there. They don't do that, you know. They just go in, kick the door, walk in with guns. And you know, it's... Poor people live in trailer parks and, you know. Throw them down. I've had them where they've done a lot worse than this, but... So this isn't the first time I've heard this type of situation. So that's what I want to know. If I may, Your Honor, I'll address the... I want DEA agents. I want DEA agents whose work is competent. Yeah. Your Honor, if I may, I'll address the questions chronologically, beginning with how the agents got there and then turning to what ensued once they were inside the residence. But what we know from the record is that there were different sets of agents doing the initial investigation, providing the affidavit to the magistrate judge. And then a separate set of agents who received the warrants did, you know, surveillance prep work for the search and then executed the warrants on the house. And I think what is legally relevant here, which may not be the same as answering Your Honor's question about how we got to the search warrant in the first place, but what is legally relevant is that the warrant was valid on its face. I'm just asking you, I want to know what happened here. What did they find out, this first group? What information did they have? Yes, Your Honor. What information did the second group have? Huh? Because of the way the case has been litigated, the record is somewhat thin on this point. But we know that there was surveillance, both wiretap and visual surveillance of the area that suggested that Mr. Alvarez lived in the neighborhood. And he did, in fact, live two doors down from the plaintiffs in a nearly identical house. And then there was the DMV information that suggested that Mr. Alvarez's vehicle was registered to the plaintiff's address. Well, was there such information? There couldn't have been. Your Honor, so the two vehicles, the plaintiff's vehicle and Mr. Alvarez's vehicle were seen in proximity to each other. Well, that's a different question. That's completely different than saying that Mr. Alvarez's vehicle was registered to the Avena's house. I mean, there is no evidence of that.  It's not so, Your Honor. And the other point is kind of ridiculous. If we were actually looking at probable cause, that the two people are parked next to each other proves that therefore, I mean, I don't know what's parking in front of my house. I didn't mean to suggest that they were, oh, with respect to the house. In terms of the two vehicles being seen together at a separate address outside the neighborhood. They weren't together. They were just both parked there. Right, Your Honor. But I offered it only to make the point that it seems that whatever error happened here was at most a matter of negligence and not of something more. We really have no idea. Are you going to answer Judge Graber's question and then I have a question? Yes, Your Honor. So once the agents are in the home executing the warrants, they're moving incredibly quickly. Again, they think that there is a dangerous person in here with weapons. And in a matter of moments, they've encountered Mr. and Mrs. Avena. They asked them to get down on the ground. Mr. Avena resists. And as all of this is unfolding, the agents go running to the girls' bedrooms. They're in two separate rooms. And they don't know what they're going to find in there. It's dark. It's 7 o'clock in the morning in January. The mother says to them first something like, don't hurt my babies. She does. But she's saying that as they're running in there. And the case law is replete with admonitions, admonishments that the court must bear in mind what the circumstances are when agents are undertaking searches like this. But they had some idea that there were children in the house. They were told that. I think the fleeting reference as they're entering the rooms, don't hurt my babies, don't hurt my babies, is not enough to tell them. But they can see that they're children. There's no allegation that these kids were so mature-looking that you couldn't tell that they were pre-teen and teenage kids. Your Honor, when they entered the rooms and handcuffed the girls, it was dark. They couldn't tell who was under the covers. How did they handcuff them if they couldn't see them? Well, they did order them to get to the floor. And the handcuffing happened there. But this is all happening. I thought they had called a gun first. They entered the room. That's standard procedure to enter the rooms, brandishing their weapons. I thought they put a gun to one girl's head. Your Honor, I believe that's untrue. There is an ambiguous reference in the record suggesting that the gun may have been in proximity. But that is not mentioned anywhere in the plaintiff's brief. It hasn't formed any part of their argument. Well, under State law, would merely pointing the gun from a distance even constitute assault and battery? Leave it. I mean, it could be outrageous conduct. But doesn't there have to be a touching? So it wouldn't be. For battery, Your Honor, there does have to be a touching. So the issue then becomes the handcuffing. So once they have pointed the weapon, because they don't know who's in there, it might be the kid and a bad guy, I mean, presumably. But once they see that it's a little kid, why do they go ahead and, I mean, isn't that a jury question, I guess, as to whether they should go ahead and handcuff an 11-year-old when they can see that there's nobody else in the room? Your Honor, I think Mueller is instructive in this regard. And to be sure, the ages were somewhat different in Mueller. But in terms of what conduct is reasonable when you're moving quickly through things, the Supreme Court emphasized that it's in everyone's interest, as agents are trying to ascertain what's going on, who's there, what the dangers actually are in the situation, to secure all of the occupants of the house. Including children? What if it was a 5-year-old? Your Honor, that may very well be a different case. And we would need to know about the appearance of the child. Although I don't know that it's terribly relevant here. It actually does appear that the younger girl was 12, just a couple months shy of 13, actually, rather than 11. Our brief is inaccurate in that regard. And you can find that in the record at ER, the second volume, 52 and 124. But why isn't that a jury question as to what was reasonable once they visually ascertained that this was a girl alone in the room? Well, Your Honor, there's no suggestion that they did ascertain that in the moment. So again, as things are happening very quickly. But they had to have before they handcuffed her. Well, at the ages of 12 and 14, it's not clear that they would have seen a small child. So they handcuffed her and moved her to a central location. And then the record does tell us that once they learned the girl's ages, they removed the handcuff. A half hour later. Roughly a half an hour later. They were still looking for Mr. Alvarez, still looking for contraband. Again, the situation was tense, uncertain, and rapidly evolving, as these things tend to be. And here's my legal question. Under California law, which is what we're doing, would it matter if they were improperly in the house, i.e. if they didn't have probable cause to be there to begin with, in terms of the excessive force claim? In other words, let's assume everything else happened in the house as it did. Let's assume, hypothetically, for purposes of this question, that what was there would not have been excessive force if they were properly in the house. Now, if they were improperly in the house, though, would California law care about that for purposes of assault and battery? Your Honor, I do think that's a harder question. And part of what makes it hard is- I know it's a hard question. What's the law? There must be some law in it. To my knowledge, I don't have a clear answer for you. We've been proceeding on either of two analogies, either the citizen's arrest analogy or the privilege entry of the premises identified in the restatement at 212. And the citizen's arrest analogy is somewhat imperfect there. I think if a person doesn't actually have the predicate authorization required to make a citizen's arrest, then what follows that they're not entitled to use the same force? Obviously, this situation, the question is, at most, the validity of the warrant. But you do have a warrant and agents authorized to be in the house. I don't know what the analogy to the citizen's arrest holds. And that is one of the difficult things about the FTCA and the law enforcement context. To the extent that the analogy- You don't know the answer in terms of California law? No, Your Honor. I don't either. But again, I would urge that particularly the way the case has been argued and what we have in the record, there is no reason to think that the warrant was not valid on- the warrants, I should say, were not valid on their face and that the agent's entry was authorized. And with respect to the conduct once they were- Well, let's- we can follow that line of reasoning. But, I mean, let's assume that that was true. But then you have excessive force used. Now, wouldn't it be relevant to the agent's state of mind, maybe? I'm just thinking about this. Whether when they entered the premises with a battering ram, whether at that time there was sufficient surveillance, investigation, or evidence to lead a reasonable agent to believe that someone that lived in that place was engaged in illegal activity. You see, a lot of times what happens is an agent will go by and will look at a house, make a cursory examination, see a car, check the license out. The car could be in the street. They might even call the Department of Water and Power and find out the name of the person who's living in that house, who's paying the bills, and that that's the person they're satisfied that that person is still there. And, you know, then they'll show up two months later. Two months later. They're looking for, say, African-American people. They show up two months later on that stale information. They forget that there was a for sale sign. I've got other people who just happen to be employed by our Defense Department, see. And they go in there and they're white people. And they go in there and they enter and they carry on almost like you did here. In that case, I don't want to go into all the details on it, but, you know, clearly the evidence was very stale. And here you tell us that these two had cars that were parked near each other, that their homes were adjacent to each other, their trailer homes. I don't know. From what I hear, it just sounds to me like they went off half-cocked. Never mind that a magistrate looked at all of that. And I don't know this magistrate. But, you know, I was on the district court. I had a lot of agents come around and hand me warrants and affidavits. Everybody's in a big hurry, huh? Well, I had them wait out there until I read everything. Everything's a crisis. We've got to have it now. Like real estate agents, if you don't buy now, the deal is gone. So that's why I think all this other information is important, but we have to focus on what happened in that house. I think that's right, Your Honor. Your question does raise one important point. In the plaintiff's brief, they suggest that one of the things that makes this case distinguishable from Mueller is that, in addition to trying to distinguish it on the basis of the wrong house, they suggest that in Mueller, the agents entered the house and immediately saw evidence of contraband and drug trafficking, other illegal activity. And that's actually not borne out by the court's opinion in that case. Those items were eventually found. But if part of the question is when the agents are entering and they're taking everything in, is there a reason, as your question suggested, to think that the information is inconsistent with what they expected to find? There's nothing in the record to suggest here that the agents should have known upon entering. There's nothing. They didn't, you know, discover baby toys or children's implements. But the difference to me from Mueller is that they were told when they went in that there were children in the house, essentially.  didn't look like children. And they treated them, and they did not take that into any count at all in the way they were handled, for a half hour. And they had them at gunpoint. They had them. They threw one of them on the ground. They handcuffed them, and they left them there for a half hour. And the justification for Mueller is to preclude any interference or dangerousness and so on. And isn't it relevant that you're dealing with a kid? I think it is potentially relevant, Erin. I do want to make a couple points. One thing, even with people of this age, certainly, and perhaps even younger children, you're not only worried about, you know, what deliberate violence they might do, but whether they might just run out while the agents are still... And that would be terrible? If they made a sudden movement toward a parent and the agents didn't correctly perceive what was happening, it could create a dangerous situation. And the court discusses, for that reason, in Michigan v. Summers, and I think also in Mueller, that it's partly for that reason that... And what's disturbing about this case is that, to me, it's just that there is some basic respect for humanness in terms of dealing with citizenry. You'd think if they saw kids, they would say they would shepherd them in some way, they would protect them in some fashion, and they would at least be nice to them. There's just no reason to behave this way, as far as I can tell. I think the reason, Your Honor, and I think it's hard to overemphasize how quickly all of this was unfolding and what the officers' reasonable expectations were, but in terms of the initial entry into the rooms and the initial handcuffing and shepherding them to that central location, it all happened very quickly. Well, the one thing they knew they didn't have was the guy they were looking for. But at the point that they entered the girls' rooms, the fact that they didn't have that guy cuts the other way because they expected that they might find him in those rooms. Right, but they didn't think the 11-year-old or the 12-year-old was him. No, but it takes some time to figure that out when it's dark and when they're under the covers. All right, but not a half hour. It perhaps would have been better had this been resolved in a shorter period of time, but I don't think that it went on so long as to be unreasonable. After they were brought to the couch, the agents had to continue their preliminary search. They still hadn't found Alvarez and still didn't know why it was that they hadn't found him. But don't you think reasonable expectations would arise out of the earlier investigation as to whether those people were suspected of dealing in drugs? That's part of it, huh? That's part of it. Otherwise, if you really do a thorough job investigating these folks, I don't know what would happen. And you know that these were gang members and then your reasonable expectations, what they would find there would make your adrenaline flow and you'd be thinking and worrying and all that. But if you didn't do much of an investigation and if you'd done an investigation, maybe you'd have known there were two young girls that lived in that house. Well, that certainly colors our sense of the case, Your Honor. I don't think it is... It doesn't. I think that's all relevant. I don't think it is relevant. Well, because you're the one that said what their reasonable expectation was. We have to look at these officers as they entered the house and undertook the challenge course of conduct. But right, but... They weren't the investigators. No, but we presume that what the investigators knew, they related to the officers that went in to execute that warrant. That's true, but the investigators themselves... We treat them as one. The investigators themselves believed that they had made a connection between this house and the illegal activity for which the warrant issued. And Leon really does make the issuance... We don't know what these people knew when they went in there. We don't even know what the investigators did, do we? Well, we know that the investigators who went in there after they received the warrant, they did further surveillance, made sure they had the right house as identified in the warrant and did their due diligence to that respect. That's why I think you have to start from the beginning because you're talking about reasonable expectations. And so that probably could come in. If I may just make one final point on the question of the children's ages and whether the comment made by Mrs. Avina as the agents were going to the girls' rooms, the relevance of that in this case. I think looking at Teckle is helpful here because the fleeting reference to my babies that she made while the agents were already on their way to the room  is readily distinguishable from what happened in Teckle where the child's mother in that case was apprehended in advance of the execution of the warrants on the house. And she told the agents that she had an 11-year-old at home. And so they knew in advance that there was going to be... Well, apparently, according to the 14-year-old, her mom kept saying, don't hurt my babies. And I remember my mom yelling, don't hurt my girls, don't hurt my girls. It doesn't sound so fleeting or at least a jury could so believe. Your Honor, the mother also describes though that she is saying, and this is on page 58 of the excerpts of record, that she's yelling this as the agents, and it's her words, that they're running to the rooms. And so in the heat of that moment, and they, again, expected to find bad people and guns in the house, that they're running in there. And for them to stop and reflect on the significance of those words, I think is not what the case law expects them to do. That in those circumstances, they reasonably moved quickly through the house to safely secure all the occupants and then assess what was going on. And once they realized, began to realize what was going on, learned the girls' agents, didn't find contraband, they moderated their behavior accordingly. And so the situation relaxed. They took the handcuffs off the girls. Again, unlike in Teklo, they allowed the girls to use the bathroom privately. They... When they knew that they were in the wrong place. They did not know yet that they were in the wrong place, but they did... They didn't find anything. They certainly, the search wasn't complete at that point, but they certainly knew more at that point than in the moment that they entered and undertook this course of conduct in the first place. Look, did they know the name of the father when they went in the house? Your Honor, I believe in the initial course of conduct of securing the occupants, they didn't stop to ascertain people's names. They had to know the names of the people when they went into the house. They knew the name of the person that they were looking for, which was Mr. Alvarez. And they did ascertain that Mr. Avena was not Mr. Alvarez. Okay, they're looking for Alvarez. Yes. Okay. Did Alvarez have a criminal record? Yes, Your Honor. He had a violent record and a history of resisting. Did Avena have a... I don't believe that's in the record, Your Honor. So if they knew they're going into a violent place, then they really have to be careful, right? Yes, Your Honor. It worked. It worked. Also, I'm sitting here reading some of the testimony. You said that they had the guns at a distance. The 11-year-old or the 12-year-old said that they put guns to my head like they're going to shoot me. Your Honor, there is... I believe you're looking at page 125 of the record. And there is a fleeting reference to that. It's unclear... What does fleeting reference mean? It's a reference. It's here. She said that's what happened. And this is on summary judgment. The question is, does she get to a jury on that? Fleeting is not relevant. Your Honor, all of the other testimony describes... So what? And I believe that is consistent with the agents brandishing their guns. And that's her recollection of that. But what is more to the point is that the agents... Or excuse me, the plaintiffs have not made anything of that remark. That is that... So what? It's here. But it's not... The case has been litigated the way it's been litigated. And that's not their argument. No for review of summary judgment motion. Yes, Your Honor. But the case law does suggest that the court's role is not to scour the record. Well, I... Looking for the genuine issue. This is the first time I actually read that. And I knew that was a fact. So I must have gotten out of the briefs. Your Honor, there are citations to that page. But the plaintiffs emphatically do not argue that guns were pointed at heads. They refer to brandishing. And again, as Your Honor suggested earlier, it's not clear that the brandishing is itself, if in fact plaintiffs are asserting a battery claim for which touching is required, that the brandishing of guns is even relevant to that claim. I think we understand your position. Thank you, Your Honor. Yeah, you did a good job for the Justice Department. Is that your supervisor? What's he doing there? Aside from my last question, you did a very helpful job. All right. No, I have no... Yeah, you're getting smart now. Okay. Hope you got an education. All right. This matter is submitted. And we'll go to the second one. Herrera v. County of Los Angeles.
judges: Pregerson, Graber, Berzon